Cite as 2020 Ark. 297

# SUPREME COURT OF ARKANSAS
No. CR-19-643

|  |  | **Opinion Delivered:** October 1, 2020 |
|---|---|---|
| LARON HAYES, JR. | | |
| | APPELLANT | APPEAL FROM THE BRADLEY COUNTY CIRCUIT COURT [NO. 06CR-17-71] |
| V. | | |
| STATE OF ARKANSAS | | HONORABLE SAM POPE, JUDGE |
| | APPELLEE | |
| | | AFFIRMED IN PART; REVERSED AND REMANDED IN PART. |

**KAREN R. BAKER, Associate Justice**

On April 25, 2019, Appellant Laron Hayes, Jr., was convicted by a Bradley County Circuit Court jury of first-degree murder, two counts of aggravated assault, and first-degree terroristic threatening. He was sentenced to life imprisonment plus a fifteen-year firearm enhancement for his first-degree-murder conviction. Additionally, he received six years' imprisonment and was fined $10,000 for each of his other convictions. Hayes's sentences are to be served consecutively. On appeal, Hayes challenges the sufficiency of the evidence as to each conviction. Because this case involves a sentence of life imprisonment, jurisdiction is properly in this court pursuant to Arkansas Supreme Court Rule 1-2(a)(2). We affirm Hayes's convictions but reverse the amount of assessed court costs and remand the case for the limited purpose of the entry of an amended sentencing order reflecting the correct amount of court costs.

## I. *Facts*

On December 28, 2017, Hayes was charged with first-degree murder for the December 26, 2017 shooting death of Colby Rice; aggravated assault of Jeff Woodall; aggravated assault of Michael Tullos; and first-degree terroristic threatening of James Scott Pope. At trial, Woodall testified that on December 26 he was talking to Rice and Hayes in Hayes's yard. Woodall testified that as Hayes got in his Jeep to leave, Rice tried to prevent Hayes from driving away because Hayes had been drinking alcohol and did not need to be driving. Rice reached into Hayes's vehicle to take Hayes's keys, and Hayes removed a pistol from the Jeep's console. According to Woodall, Rice stated everyone knows that "[Hayes] ain't going to do nothing with [the pistol]." Woodall testified that Hayes put the pistol back into the console, and the three men continued to talk. As Hayes attempted to leave again, Rice tried to get Hayes's keys through the Jeep's open door. Hayes then pushed Rice out of the vehicle and pulled his pistol back out and said, "[W]atch this, Woodall," and shot Rice. Woodall testified that he knew Rice had been hit because there was a bloodstain on the Jeep's door jamb. Hayes instructed Woodall to get in his own vehicle and leave. As Hayes began backing out of the driveway, Woodall pulled out his phone to call 911. Hayes got out of his Jeep and starting pursuing Woodall with the pistol pointed at him. Woodall testified that as he ran from Hayes, Woodall's phone fell out of his pocket and he spun around to pick up his phone. Woodall then saw Hayes standing up after falling with the pistol still pointed at him. Woodall ran to a nearby house and the resident called the police.

2

Larry Allen Hayes, Hayes's brother, testified that on December 26, 2017, he spoke with Hayes on the phone. At approximately 2:45 p.m., Hayes called Larry and told him that he had killed Rice. Larry testified that Hayes called him two or three more times, stating the same thing and that "he was tired of people messing him over."

Kimberly Hayes, Larry's wife, testified that on December 26, she was checking out at a grocery store when Hayes walked up to her and told her that he had just killed Rice. Hayes then told Kimberly that he was going to go kill her cousin, Jason Mann, and that he had others he was going to kill too. Kimberly testified that Hayes stated that he was "not taking this shit anymore, something like that." Hayes left the store, and Kimberly saw him pull up to the store's window and point down to the blood on the outside of his Jeep.

Pope testified that on December 26, he received a phone call from Hayes. At some point, Pope's wife began recording the conversation. During the conversation, Hayes told Pope that he had just killed Rice. Pope provided the recording to the police, and the recording was played for the jury. The relevant portions of the phone conversation are as follows:

HAYES:      I'm coming for your ass, too. Where you at?

POPE:       I just told you. I'm in Warren.

HAYES:      Yeah. You ain't in Warren.

POPE:       I am in Warren. My ~ I'm at work.

HAYES:      You understand I'm fixing to kill you. Right? Like, I'm not going to play with it no more. Like, I'm fixing to kill you, just like I, just like I, just like I kill him. But I'm, I fixing to kill you. Right? So are you ready? Are your ready to start talking?

3

POPE:       That's up to you.

HAYES:      You think I won't kill you?

POPE:       Do what?

HAYES:      You think I won't kill you?

POPE:       No. I'm not doubting you. I just ain't understanding.

. . .

HAYES:      Do you want to start talking to them or do you want to fucking die, goddamit? Tell me what the fuck you want, cause I don't give a fuck. I don't give a fuck no more, man. What do you want? Do you want to die or do you want to start talking to me?

. . .


HAYES:      I guess we're not going to talk about a damn thing. Where the fuck you at?

POPE:       I done told you twice. I'm in Warren at work.

HAYES:      Oh, you're at work?

POPE:       Yeah.

HAYES:      Yeah. You ain't at work in Warren. So why you lying? You think I'm some kind of bitch, don't you think? That's what you think about me, don't you, Scott?

POPE:       No.

HAYES:      You don't understand. I just killed your best friend. That motherfucker's (inaudible). He just jumped in and stealed my best friend from me. I just killed him, Scott. He's dead. He is laying in my fucking yard dead. Do you not understand? You ain't got this text message yet, but he is dead. I just busted --

4

I've got brains on the side of my motherfucking Jeep, you hear me?

Jeff Woodall ran like a motherfucker. And I said if I see you walk by, I'll get your ass, too. Do you know what? That's who called the police, Jeff Woodall. I'm going to get his ass, too, cause I got four fucking vehicles –

(Whereupon, the playing of State's exhibit two was concluded.)

Kyle Everett testified that on December 26 at approximately 3:30 or 4:00 p.m., Hayes was sitting in his parked Jeep in Everett's driveway. Everett told Hayes to move out of his way. Hayes jumped out of his Jeep and pointed at the blood on the side of his vehicle and stated that it was Rice's blood. Hayes then drove off and Everett contacted the police.

Michael Tullos testified that on December 26, he saw Hayes close to Hayes's childhood home, where Everett lived. Tullos testified that as he was sitting inside of his vehicle, he saw Hayes get out of his Jeep, go around to the back door, and retrieve a shotgun. Tullos testified that Hayes pointed the gun at him from a distance of approximately one hundred yards. Tullos drove away and Hayes followed him, staying within one hundred to two hundred yards.

Kevin Black, chief deputy of the Bradley County Sheriff's Office, and Scott Woodward with the Arkansas State Police, both testified that they responded to a shooting call on December 26. Chief Deputy Black and Officer Woodward were asked to review several State exhibits, including photographs of the deceased Rice. Both law enforcement officers testified that Rice's body was found with his hands tucked inside his coveralls.

5

Chief Shawn Hildreth of the Warren Police Department testified that he took part in the arrest of Hayes on December 26. When Officer Hildreth arrived on the scene, he saw Hayes standing in the yard of his childhood home pointing a shotgun in the direction of where Officer Hildreth's officers were parked. Hayes proceeded to get into his Jeep and was ultimately taken into custody.

Arkansas State Police special agent David Tumey testified that a search of Hayes's Jeep revealed a cell phone, a jammed 9 mm Glock handgun, and a 12-gauge shotgun loaded with five slug rounds. Special Agent Tumey interviewed Hayes the day after the shooting, and the video of the interview was played for the jury. During the interview, Hayes stated that on the morning of the shooting at approximately 10:00 or 11:00 a.m., Rice sent Hayes a text about going to get some beer. Hayes stated that he picked up Rice and they purchased beer and vodka. Hayes and Rice then went back to Hayes's camp where they talked and drank for some time, but the pair ended up "getting into it." When asked why Hayes and Rice began fighting, Hayes stated, "Ah, just shit that happened in the past. . . . He was in my business about something that he didn't need to be. And we got into it." With regard to Woodall, Hayes stated the he flagged Woodall down to look at installing central heat and air at his camp. After Woodall looked at his camp, Hayes stated that "me and [Rice] got into it. . . . We had some words there. He was just being a little smartass, whatever, and I ~ Shit. It is what it is, man. It happened." Detective Tumey informed Hayes that Woodall did not witness the two men fighting. Hayes responded that he and Rice got into it before Woodall arrived. Hayes explained that his argument with Rice stemmed from

6

events surrounding his divorce two years earlier. Hayes stated that Rice took his "[ex-wife's] side for everything." Hayes then explained that he and Rice "got into it" because Rice's "baby's momma's . . . was messaging me on Facebook and she wanted me to . . . go out with her." According to Hayes, when Rice found out about the Facebook message, Rice told Hayes that he was going to kill him. Hayes stated this was the first time that he and Rice had hung out together in a while. Hayes also stated that he did not recall attempting to leave in his Jeep and Rice attempting to prevent him from driving because he had been drinking.

Hayes stated that he owned a Glock 9 mm handgun and a 12-gauge shotgun. Hayes stated that he remembered reaching and getting his gun from his Jeep console and shooting Rice. When asked why he shot Rice, Hayes said, "I don't know." When Detective Tumey stated that there had to be some reason he shot Rice, Hayes answered, "It was because we were into it. He told me he was going to kill me." Hayes then contradicted himself and went on to explain that Rice did not state that he was going to kill him on the day of the shooting but that Rice had previously said so. Further, Hayes stated that Rice did not tell him why he was going to kill him. Then Hayes said that Rice was going to kill him because Hayes had been talking to his "baby momma." Detective Tumey asked Hayes why he would hang out with a man who had threatened to kill him. Hayes responded, "I don't know."

Arkansas State police officer Morris Knight performed a "phone dump," or data extraction, of Hayes's cell phone. Text messages extracted from Hayes's phone establish

that Hayes and Rice had a friendly text-message exchange on the morning of December 26 and agreed to drink beer together. Further, at 11:26 a.m., Hayes received a text message from Rice containing a selfie of the two standing together and smiling, taken that morning.

Dr. Charles Paul Kokes, chief medical examiner with the Arkansas State Crime Laboratory, testified that he performed an autopsy of Rice's body. Dr. Kokes concluded that Rice died as a result of a contact gunshot wound to his head. Dr. Kokes explained that a contact gunshot wound results when there is direct physical contact between the gun muzzle and the site of entry. Dr. Kokes testified that the site of entry was just above Rice's right eye.

At the close of the State's case, which was also the close of evidence, Hayes moved for a directed verdict as to all four charges. The circuit court denied Hayes's motions. Hayes was convicted and sentenced as set forth above. This appeal followed.

II. *Standard of Review*

On appeal, a motion for a directed verdict is treated as a challenge to the sufficiency of the evidence. *Reynolds v. State*, 2016 Ark. 214, 492 S.W.3d 491. This court views the evidence in the light most favorable to the State and affirms if there is substantial evidence to support the verdict. *Id.* Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Id.* This court does not weigh the evidence presented at trial or assess the credibility of the witnesses, because those are matters for the fact-finder. *Id.* The trier of fact is free to believe all or part of any witness's testimony and

may resolve questions of conflicting testimony and inconsistent evidence. *Id.* Only evidence supporting the verdict will be considered. *Leaks v. State*, 345 Ark. 182, 45 S.W.3d 363 (2001).

III. *Arguments on Appeal*

A. First-Degree Murder

1. *Directed-verdict motion––preservation*

For his first point on appeal, Hayes argues that the circuit court erred in denying his motion for directed verdict on the charge of first-degree murder because there was insufficient evidence that he acted purposely when he shot and killed Rice. According to Hayes, there was conflicting evidence as to whether he acted purposely. Specifically, he contends that there was evidence that he had been intoxicated and may have been under the influence of antipsychotic drugs prescribed by a nurse practitioner. Thus, Hayes asserts that if his perception and behavior were affected by the alcohol and drugs in his system, then it was possible that he did not have full control over his actions and did not act purposely. Further, Hayes contends that there was no indication that he actively engaged in an argument or dispute with Rice at the time of the shooting. Additionally, Hayes asserts that during his interview with Special Agent Tumey, Hayes gave conflicting reasons for why he killed Rice. In sum, Hayes contends there was insufficient evidence that he purposely killed Rice or that he acted with a conscious object to cause the death of Rice. The State responds that Hayes's argument is not preserved for review.

Prior to reaching the merits of Hayes's first point on appeal, we must address the State's position that Hayes failed to preserve the issue for review. With regard to sufficiency-of-the-evidence challenges, Arkansas Rule of Criminal Procedure 33.1 provides, in pertinent part:

> (a) In a jury trial, if a motion for directed verdict is to be made, it shall be made at the close of all of the evidence offered by the prosecution and at the close of all of the evidence. A motion for directed verdict shall state the specific grounds therefor.
>
> . . . .
>
> (c) The failure of a defendant to challenge the sufficiency of the evidence at the times and in the manner required in subsection[ ] (a) . . . will constitute a waiver of any question pertaining to the sufficiency of the evidence to support the verdict or judgment. A motion for directed verdict or for dismissal based on insufficiency of the evidence must specify the respect in which the evidence is deficient. A motion merely stating that the evidence is insufficient does not preserve for appeal issues relating to a specific deficiency such as insufficient proof on the elements of the offense.

Rule 33.1 is to be strictly construed. *Carey v. State*, 365 Ark. 379, 230 S.W.3d 553 (2006) (citing *Pinell v. State*, 364 Ark. 353, 219 S.W.3d 168 (2005)). Accordingly, in order to preserve a challenge to the sufficiency of the evidence, an appellant must make a specific motion for a directed verdict, both at the close of the State's case and at the end of all the evidence, that advises the circuit court of the exact element of the crime that the State has failed to prove. *Id.* (citing *Grady v. State*, 350 Ark. 160, 85 S.W.3d 531 (2002)). However, when a defendant presents no evidence after a directed-verdict motion is made, further reliance on that motion is not waived. *Robinson v. State*, 317 Ark. 17, 875 S.W.2d 837 (1994). The reason underlying the requirement that specific grounds be stated and that the

absent proof be pinpointed is that it allows the circuit court the option of either granting the motion or, if justice requires, of allowing the State to reopen its case and supply the missing proof. *Carey v. State*, 365 Ark. 379, 383, 230 S.W.3d 553, 557 (2006) (citing *Webb v. State*, 327 Ark. 51, 938 S.W.2d 806 (1997)). A general motion that merely asserts that the State has failed to prove its case is inadequate to preserve the issue for appeal. *Id.* (citing *Beavers v. State*, 345 Ark. 291, 46 S.W.3d 532 (2001)).

The State asserts that Hayes's motion included none of the specific arguments he now makes on appeal; therefore, his arguments are not preserved for our review. To support its position, the State relies on *Perry v. State*, 2014 Ark. 535, 453 S.W.3d 650, in which Perry made the following motion for directed verdict: "Your Honor, we'd ask for a directed verdict of acquittal. That the government hasn't presented enough evidence to take the case to the jury. It's insufficient for that." *Id.* at 4, 453 S.W.3d at 653. We held that Perry's general motion failed to specify any deficiencies in the State's proof and was inadequate to preserve for appellate review the specific challenges to the sufficiency of the evidence sought to raise on appeal. *Id.*

In the present case, Hayes moved for a directed verdict as follows:

Judge, for purposes of the record, I would move that the State has failed to present evidence beyond speculation and conjecture, one, on the charge of first degree murder that my client acted purposely in causing physical or causing the death of Colby Rice.

A careful review of Hayes's motion for directed verdict demonstrates that in contrast to *Perry*, Hayes advised the circuit court of the exact element of first-degree murder

that he contended the State failed to prove—purpose. Thus, we disagree with the State's position that Hayes's motion for directed verdict was insufficient.

*2. Sufficiency of the Evidence*

We turn now to the merits of Hayes's first point on appeal. Hayes was convicted of first-degree murder under Arkansas Code Annotated section 5-10-102, which states in pertinent part:

(a) A person commits murder in the first degree if:

. . .

(2) With a purpose of causing the death of another person, the person causes the death of another person[.]

Ark. Code Ann. § 5-10-102(a)(2) (Supp. 2017). Intent is seldom capable of proof by direct evidence and must usually be inferred from the circumstances surrounding the killing. *Starling v. State*, 301 Ark. 603, 786 S.W.2d 114 (1990). The intent necessary for first-degree murder may be inferred from the type of weapon used, the manner of its use, and the nature, extent, and location of the wounds. *Garza v. State*, 293 Ark. 175, 735 S.W.2d 702 (1987). A person acts purposely with respect to his or her conduct or a result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result. Ark. Code Ann. § 5-2-202(1) (Repl. 2013). The purpose to commit a crime can be formed in an instant. *Tarentino v. State*, 302 Ark. 55, 786 S.W.2d 584 (1990).

We turn to the testimony presented. In evaluating whether substantial evidence supports the jury's finding of purpose, we review the evidence in the light most favorable to the State. First, Woodall testified that Hayes removed his gun from the console when Rice

12

attempted to take Hayes's key. Hayes then placed the gun back into the console, and the men continued to talk. When Hayes attempted to leave for the second time, Rice again tried to take the keys from Hayes. Woodall testified that Hayes then shoved Rice out of his Jeep, pulled the gun out of the console, pointed it at Rice, and said, "[W]atch this Woodall" and then shot Rice.

Further, we note Hayes's behavior after the murder. Woodall testified that when he attempted to call 911, Hayes ran after him while pointing his pistol at him. Larry testified that Hayes called him and told him that he had killed Rice and that "he was tired of people messing him over." Kimberly testified that as she was checking out at a grocery store, Hayes walked up to her and told her that he had just killed Rice. Kimberly testified that Hayes said he was "not taking this shit anymore, something like that." Pope testified that Hayes told him that he had just killed Rice. During the recorded portion of the telephone conversation, Hayes stated, "I'm coming for your ass, too. Where you at?" Hayes then asked, "Do you want to start talking to them or do you want to fucking die, goddamit? Tell me what the fuck you want, cause I don't give a fuck. I don't give a fuck no more, man. What do you want? Do you want to die or do you want to start talking to me?" Tullos testified that Hayes pointed a shotgun at him from approximately one hundred yards. Also, Dr. Kokes testified that Rice died a result of a contact wound, which is direct physical contact between the gun muzzle and the site of entry.

Based on the testimony above, we conclude that there was sufficient evidence that Hayes acted with purpose to cause Rice's death. To the extent that Hayes asserts that he

13

killed Rice because Rice threatened to kill him, we note the photographic evidence and the testimony of Chief Deputy Black and Officer Woodward that Rice's body was found with his hands tucked inside his coveralls. Thus, the position of Rice's hands clearly negates Hayes's statement that he killed Rice in response to Rice's threat to kill him. Also, during the guilt phase of the trial, Hayes did not present evidence regarding his prescription-medication intoxication. Further, with regard to his alcohol intoxication, it is well established that voluntary intoxication does not negate criminal intent. Ark. Code Ann. § 5-2-207 (Repl. 2013); *Reynolds v. State*, 2020 Ark. 174, 599 S.W.3d 120 (citing *True v. State*, 2017 Ark. 323, 532 S.W.3d 70).

In sum, the jury could reasonably have inferred from the testimony, the type of weapon used, the manner of its use, and the location of Rice's wound, that Hayes purposely killed Rice. We hold that substantial evidence supports Hayes's first-degree-murder conviction, and the circuit court did not err in denying Hayes's motion for directed verdict.

## B. Aggravated Assault of Jeff Woodall

### *1. Directed-verdict motion––preservation*

For his second point on appeal, Hayes argues that the circuit court erred by not granting his motion for directed verdict on the charge of aggravated assault involving Woodall because the evidence was insufficient as to whether he engaged in conduct under circumstances manifesting extreme indifference to the value of human life or that he acted purposely.

The State responds that Hayes's argument is not preserved for review because the specific arguments made on appeal were not made in the directed-verdict motion. We disagree with the State's preservation argument. Hayes's motion for directed verdict stated as follows:

> On the aggravated assault on Mr. Woodall, I think that's Count Two, I would likewise say that they did not prove beyond speculation and conjecture that it was under circumstances manifesting extreme indifference to the value of human life or that he had the purpose to, or he acted purposely in that respect.

Thus, a review of Hayes's motion for directed verdict demonstrates that he identified the exact elements of aggravated assault that he contended the State failed to prove—that he acted under circumstances manifesting extreme indifference to the value of human life and that he acted purposely.

## 2. Sufficiency of the Evidence

Turning now to the merits of Hayes's second point on appeal. Arkansas Code Annotated section 5-13-204(a)(1) (Repl. 2013) provides that a person commits aggravated assault if, under circumstances manifesting extreme indifference to the value of human life, he or she purposely engages in conduct that creates a substantial danger of death or serious physical injury to another person. A person acts purposely with respect to his or her conduct or a result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result. Ark. Code Ann. § 5-2-202(1). "Serious physical injury" is defined as "physical injury that creates a substantial risk of death or that causes protracted disfigurement, protracted impairment of health, or loss or protracted

15

impairment of the function of any bodily member or organ." Ark. Code Ann. § 5-1-102(21) (Repl. 2013). Further, we have held that, as a result of the difficulty in ascertaining the actor's state of mind, a presumption exists that a person intends the natural and probable consequences of his or her acts. *Harmon v. State*, 340 Ark. 18, 8 S.W.3d 472 (2000). The fact-finder may draw upon common knowledge and experience to infer the defendant's intent from the circumstances. *Id.*

Here, Hayes contends that there was insufficient evidence to demonstrate that he acted under circumstances manifesting extreme indifference to the value of human life and that he acted purposely. Hayes argues that the only evidence presented was that Hayes ran after Woodall, stumbled, and pointed a gun at him. Hayes further argues that there was no evidence regarding the distance between Hayes and Woodall, the length of time the gun was pointed at Woodall, or whether he intentionally pointed the gun at Woodall.

The record demonstrates that Woodall testified that after stating "watch this Woodall" and shooting Rice at close range, Hayes told him to get in his vehicle and leave. Woodall testified that when he pulled out his phone to call 911, Hayes got out of his Jeep and began running after him while pointing his pistol at him. As Woodall ran, his phone fell out of his pocket, and when he spun around to pick up his phone, he saw Hayes stand up after a fall and continue to pursue him with his pistol still pointed at him.

Under the facts of this case and in viewing the evidence in the light most favorable to the State, we hold that the jury could reasonably conclude that Hayes created a substantial danger of death or physical injury under circumstances manifesting an extreme

16

indifference to the value of human life when, after having shot Rice, Hayes ran after Woodall with his pistol pointed at him. We hold that substantial evidence supports Hayes's aggravated assault conviction with regard to Woodall, and the circuit court did not err in denying Hayes's motion for directed verdict.

## C. Aggravated Assault of Michael Tullos

### 1. Directed-verdict motion––preservation

For his third point on appeal, Hayes argues that the circuit court erred by not granting his motion for directed verdict on the charge of aggravated assault involving Tullos. He contends that the evidence was insufficient because his display of the firearm did not put Tullos in substantial risk of danger when he pointed a 12-gauge shotgun in the direction of Tullos, who was one hundred yards away. The State responds that Hayes's argument is not preserved for review because the specific arguments made on appeal were not made in the directed-verdict motion.

Hayes motion for directed verdict stated as follows:

On the aggravated assault on Mr. Tullos, I would move that they failed to provide any evidence beyond speculation and conjecture that the display of any firearm would put anyone in substantial risk of danger because the evidence showed only that it would have been a shotgun. And I think Mr. Tullos'[s] testimony was that the closest he got was a hundred yards.

A review of Hayes's motion for directed verdict demonstrates that he preserved for appeal the issue of whether his display of the shotgun at a range of one hundred yards amounts to conduct that creates a substantial danger of death or serious physical injury to another person.

17

## 2. *Sufficiency of the evidence*

Again, Arkansas Code Annotated section 5-13-204(a)(1) provides that a person commits aggravated assault if, under circumstances manifesting extreme indifference to the value of human life, he or she purposely engages in conduct that creates a substantial danger of death or serious physical injury to another person. A person acts purposely with respect to his or her conduct or a result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result. Ark. Code Ann. § 5-2-202(1). Our court of appeals has found that evidence was sufficient to support an aggravated-assault conviction when the appellant pointed a gun at the victim, and during a subsequent search of appellant's vehicle the police found a loaded .25 semi-automatic. *Dillehay v. State*, 74 Ark. App. 100, 103, 46 S.W.3d 545, 547 (2001).

Here, Tullos testified that as he was sitting inside his vehicle, he saw Hayes get out of his Jeep, go around to the back door and retrieve a shotgun. Tullos testified that Hayes pointed that gun at him from a distance of approximately one hundred yards. Tullos drove away and Hayes followed him, staying within one hundred to two hundred yards. Officer Hildreth testified that when he arrived on the scene, he saw Hayes pointing a shotgun in the direction of where Officer Hildreth's officers were parked. Special Agent David Tumey testified that the search of Hayes's Jeep revealed the 12-gauge shotgun was loaded with five slug rounds.

Under the facts of this case and in viewing the evidence in the light most favorable to the State, we hold that the jury could reasonably conclude that Hayes created a

substantial danger of death or physical injury under circumstances manifesting an extreme indifference to the value of human life when he pointed a 12-gauge shotgun containing five slug rounds at Tullos, even at a distance of one hundred yards. We hold that substantial evidence supports Hayes's aggravated-assault conviction with regard to Tullos, and the circuit court did not err in denying Hayes's motion for directed verdict.

### D. Terroristic Threatening

For his final point on appeal, Hayes argues that circuit court erred by not granting his motion for directed verdict on the charge of first-degree terroristic threatening involving Pope. Hayes contends that the phone call to Pope was shown as an effort to get Pope to talk or converse with Hayes about a dispute and not with the purpose of striking fear in Pope.

Arkansas Code Annotated section 5-13-301(a)(1)(A) (Supp. 2017) provides the following: "[A] person commits the offense of terroristic threatening in the first degree if[,] [w]ith the purpose of terrorizing another person, the person threatens to cause death or serious physical injury . . . to another person[.]" A person acts purposely with respect to his or her conduct or a result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result. Ark. Code Ann. § 5-2-202(1).

As set forth above, the recorded portion of the phone call was played for the jury. Thus, the jury was able to hear the rage that Hayes directed at Pope throughout the entire recording. Hayes told Pope that he had just killed Rice. Hayes then stated, "I'm coming for your ass, too. Where you at?" Further, Hayes stated, "You understand I'm fixing to kill you.

19

Right? Like, I'm not going to play with it no more. Like, I'm fixing to kill you, just like I, just like I, just like I kill him. But I'm, I fixing to kill you. Right?" Additionally, Hayes repeatedly asked Pope for his location.

Based on the record, we are not persuaded by Hayes's argument. In listening to the phone call, the jury could draw upon common knowledge and experience to infer his intent from the circumstances. *Harmon*, *supra*. We find that substantial evidence was presented that Hayes purposely threatened to kill Pope; therefore, substantial evidence supports Hayes's first-degree terroristic-threatening conviction, and the circuit court did not err in denying Hayes's motion for directed verdict.

IV. *Court Costs*

In compliance with proposed Arkansas Supreme Court Rule 4-3(a) as set forth *In re Acceptance of Records on Appeal in Elec. Format*, 2019 Ark. 213 (per curiam), the State identifies an error in the amount of court costs assessed in Hayes's sentencing order. Court costs are part of Hayes's sentence. *See, e.g.*, Ark. Code Ann. § 5-4-202(a) (Repl. 2013) ("If the defendant is sentenced to pay a fine or costs[.]") The State recognizes that while we generally do not consider an illegal-sentence claim unless it is raised by the appellant, we will do so in life-imprisonment or death-penalty cases. *See Bilderback v. State*, 319 Ark. 643, 647, 893 S.W.2d 780, 782 (1995) ("While an appellant may raise on appeal the issue of an illegal sentence without having objected to it at the trial . . . in other than life imprisonment or death sentence cases we do not consider such a question on appeal unless the appellant has raised it here.")

The sentencing order reflected that the court costs billed to Hayes were $165. Arkansas Code Annotated sections 16-10-301 and -302 (Repl. 2010) mandate assessment of uniform court costs throughout the State. Arkansas Code Annotated section 16-10-305(a) (Supp. 2017) provides that "there shall be levied and collected the following court costs from each defendant upon each conviction . . . one hundred fifty dollars ($150) for a misdemeanor or felony violation of state law[.]" Further, section 16-10-305(d) directs that "[n]o . . . circuit court shall assess or collect any other court costs other than those authorized by this act, unless specifically provided by state law." Thus, we reverse the circuit court's assessment of costs and remand with directions to enter an order for costs in the amount of $150.

V. *Rule 4-3(i) Review*

This case involves a sentence of life imprisonment; therefore, it is subject to review under Arkansas Supreme Court Rule 4-3(i). As required under Ark. Sup. Ct. R. 4-3(i), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to Hayes, and no other prejudicial error has been found.

Accordingly, we affirm Hayes's convictions but reverse the amount of assessed court costs and remand to assess court costs as set forth above.

Affirmed in part, reversed and remanded in part.

*Knutson Law Firm*, by: *Gregg A. Knutson*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Karen Virginia Wallace*, Ass't Att'y Gen., for appellee.